Helen T. KURDZIEL (formerly known as Helen T. Rosebrock, Executrix of the Estate of Franklin C. Rosebrock, Deceased), Plaintiff,

v.

PITTSBURGH TUBE COMPANY, Defendant and Third-Party Plaintiff,

v.

TRAVELERS INSURANCE COMPANY et al., Third-Party Defendants.

No. C 66–180.

United States District Court
N. D. Ohio, W. D.

Nov. 15, 1968.

Cubbon & Rice, Toledo, Ohio, Paul Lankenau, Napoleon, Ohio, for plaintiff.

Cobourn, Yager, Smith & Falvey, Fred A. Smith, Eastman, Stichter, Smith & Bergman, Frank E. Kane, Toledo, Ohio, for defendant.

## OPINION

DON J. YOUNG, District Judge.

This is an action for wrongful death, and for damages for personal injuries which culminated in the death of plaintiff's decedent some eight days after the injuries.

The plaintiff's decedent had been employed for many years by the Clevite Corporation in its plant at Napoleon, Ohio. On the morning of September 1, 1964, about 9:30 A.M., in connection with his duties, plaintiff had gone into the unloading well when a truckload of steel tubes shipped from the defendant's plant at Monaca, Pennsylvania, was being unloaded by one Travis, a fellow employee of the plaintiff. The truck was owned by the third party defendant Glenn Cartage Company, and had been driven into the unloading well some time before by the third party defendant Walter Barnes. Barnes was under orders from Travis to stay out of the way of the unloading operations. At the time of the accident he was standing some distance away looking through an open door at the operation of a machine inside the factory.

The load on the truck consisted of twenty-four bundles of steel tubes. Each bundle contained ten tubes two and one-half inches in outside diameter and twenty-five and a half feet long. The bundles weighed a little over one ton each.

The truck had been loaded the day before by the defendant. This had been accomplished by Barnes first placing across the bed of the truck two pieces of three inch by three inch timber cribbing to support the ends of the load, and then going about his personal affairs. Thereafter, the defendant's employees placed a third piece of cribbing midway between the others, and placed nine bundles of tubes upon them. Each bundle was ten inches wide. The bed of the truck was ninety inches wide, and the pieces of cribbing varied in length from eighty-four to eighty-six inches.

Three more pieces of cribbing were laid across the tubes, and another nine bundles of tubes were placed on top of them. Again three more pieces of cribbing were placed, and six bundles of tubes were placed on top of them, completing defendant's loading operations.

Barnes then returned, and placed some ten chain binders over the load, pulling them tight with a ratchet arrangement. He testified that during this process he inspected the loading, and found it to have been done in the usual manner. He did not observe that any of the pieces of cribbing were too short to support the load.

Having completed the binding, he covered the load with paper, and fastened his tarpaulin over this. He then set out to Napoleon, Ohio, a distance of some two hundred miles, making at least one stop en route for food and gasoline, at which he again checked the security of the load.

Because of construction at the Clevite plant, the unloading well was being used for the storage of materials. This made it impossible for Barnes to place his semi-trailer close to the wall of the well on its left-hand side, and his tractor was somewhat jack-knifed to the right.

By the time of the morning coffee break, Travis had unloaded the top six bundles of tubes, and the left-hand four bundles of the middle layer. After the break, he started to lift the fifth bundle. In the meantime, plaintiff's decedent had come into the well on the left-hand side of the semi-trailer to get some of the material stored in the unloading well. Travis saw him there, but continued his work without stopping or warning him.

Travis lifted the bundle, found it not properly balanced on the sling, lowered it, changed the position of the sling, and lifted it again. At that point the left-hand bundle in the bottom layer fell off the semi-trailer, hit the tire of the tractor, burst apart and fell to the floor. The falling tubes struck plaintiff's decedent, crushing his ankles. The injuries resulted in his death some days later. As to this point there is no dispute in the evidence.

The first problem presented in this case is to determine what caused the bundle of tubes to fall. The plaintiff claims that the cause was the defendant's negligence in loading the steel. Specifically, plaintiff claims that the cribbing supporting the bottom layer of bundles was too short, in that the center piece of

cribbing did not support the bundle at all, and that the front piece was about an inch short of the center line of the bundle. Thus the bundle was held in place by the pressure of the upper layers of tubing, so that when a sufficient number of bundles were removed, the reduced weight no longer held the bundle in place, allowing it to fall down upon the plaintiff's decedent.

In support of this theory, the plaintiff offered the testimony of the unloader, Travis, Plaintiff's Exhibit 10, a rather poor photograph taken a few minutes after the accident, and Plaintiff's Exhibits 14–A, 14–B, and 14–C, accident reports and memoranda from the records of Clevite.

Exhibit 14–A reports that "An investigation of the 4″ x 4″ cribing (sic) revealed front cribing (sic) to be approximately 1″ short from the center line of bundle. Center cribing (sic) did not support bundle. Rear cribing (sic) was not measured." This report is undated. It appears to be a typewritten copy of Exhibit 14–B. Apparently Exhibit 14–B was prepared by two different people, and bears the date of September 3, 1964, two days after the accident. Exhibit 14–C is a copy of a memorandum to Reg Greenham, the man who signed the two previous documents. It is dated September 2, 1964, and instructs Mr. Greenham to prepare the report.

Mr. Greenham testified that he prepared the report from an investigation he made in the afternoon of the accident.

The testimony of Travis, the unloader, is, in the main, included in the facts already recited. He told in detail his unloading procedure, which was to pry the bundles of steel apart with a length of two by four so he could pass his slings around them, and then, with an electric crane, lift them up and remove them. He also testified on direct examination that the front and center bottom pieces of cribbing were four to five inches shorter than the others.

On cross examination, Travis admitted that he had not measured the pieces of cribbing; that he had previously given a statement saying that only the center piece of cribbing was short; that the front piece was the same length as always; and that he had no idea why the bundle fell off. He also stated that he came to the conclusion that the cribbing was short, because that is the only way that the steel could have fallen.

This evidence was countered by the testimony of the third party defendant Barnes, the truck driver, that the pieces of cribbing which were furnished by the defendant were of the standard length; that he inspected the load while he was placing the chain binders, and at least once after that, and saw nothing wrong with it.

The defendant's opening statement was that the standard length of cribbing was from eighty-four to eighty-six inches, and that it was impossible to use cribbing the full length of the width of the truck bed, ninety inches, as the ends would have protruded and torn the covering tarpaulin.

Barnes also testified that the unloading of the truck was completed at noon exactly; that in accordance with Clevite's requirement that the cribbing be removed, he had placed it all on his semi-trailer, chained it down, and departed shortly after noon.

The photograph, Exhibit 10, is too dark to show the bottom cribbing in front. It does, however, show indistinctly, just below the center and about three-quarters of an inch in from the right-hand side, the bottom center cribbing, which extends to within an inch of the left-hand edge of the truck bed, and bears the impression of one of the steel tubes which rested upon it.

A careful weighing of all the evidence, thus recited in perhaps excessive detail, leads inevitably to the conclusion that the plaintiff's theory is not supported by the preponderance of the evidence. The fact is that nobody measured the cribbing. Mr. Greenham's report that it was measured is contradicted by the tes-

timony of Barnes that it was gone before Greenham made the investigation he said he made, by the conflict between the dates on Exhibits 14–B and 14–C and Greenham's testimony, and by the fact that it gives the dimensions of the cribbing as four by four. All the other evidence, including Exhibit 10, shows them to be three by three.

In addition, the physical realities conflict with the plaintiff's theory. It must be remembered that the steel tubes were oiled, which would have considerably reduced any frictional forces. If only weight and friction were holding the bundle, it would have let go when Travis first lifted the middle bundle, not when he lifted it the second time. Careful reflection also indicates that if there were no center support, and the front cribbing was one inch short of the center line of the bundle, the position was so unstable that the bundle could not have been or remained loaded in that position while the rest of the load was added, or until the binder chains were placed. If by some magic it had, it still must have fallen when the chains were removed.

Nor is any comfort to be gained from defendant's opening statement that the standard length of cribbing was eighty-four to eighty-six inches. The maximum distance between the bearing points of the outermost steel tubes of the load is eighty-five inches. Anything beyond that point carries no load. The distance between the center lines of the outermost bundles is eighty inches. A bundle poised on its center line would require no force to keep it stable, but assuming a weight of two thousand pounds (the evidence showed that the bundles weighed two thousand two hundred pounds) a force of at least six hundred fifty pounds applied downward on the unsupported side would be required to overbalance it.

It must be recognized that this is not a case for the application of the doctrine of *res ipsa loquitur*. The loaded steel was out of the control of the defendant when the third party defendant Barnes started to place the chain binders. It was out of the control of the third party defendants, and in the hands of Clevite when Barnes removed the binders. Moreover, there was no evidence to show that it is unusual for bundles of steel to shift or fall while they are being unloaded. What evidence there is on this point rather implies the contrary, since it showed that Travis did not want anybody around while he was unloading, and that he considered it would be dangerous to people to be in the vicinity of the process.

As a matter of law, the defendant would be responsible to someone who was injured as a result of its having negligently loaded the steel. The evidence completely fails to establish that the defendant was negligent.

The burden of proof in this case is upon the plaintiff. It has not been met.

This conclusion eliminates the necessity of going into such defensive matters as contributory negligence, assumption of the risk, and the fellow-servant rule. Workmen's compensation and employer's liability laws have pretty well eliminated these old rules, but they have not been totally abolished. In this type of action they are still applicable, and could be dispositive.

The disposition above indicated also disposes of the third-party claims against the defendants Glenn Cartage Company and Walter Barnes, which will also be dismissed. The third-party claim against the defendant Travelers Insurance Company has previously been determined, and that determination will stand.

This opinion will serve as the Court's findings of fact and conclusions of law. Defendant may prepare and submit an order in accordance therewith. The order should be submitted to all opposing parties for approval as to form. Any party dissatisfied with the form of the entry may submit, within five days after it has been presented to him, the form of order which he deems proper. The Court will then consider the matter and fix an entry.